SOUTHERN NEVADA HOMEBUILDERS ASSOCIATION, INC.; BARRY W. BECKER HOMES, INC.; BETTY W. BECKER INVESTMENT CO.; ERNEST BECKER HOMES, INC.; PARADE OF HOMES, INC.; ALL NEVADA CORPORATIONS AND DOING BUSINESS AS BECKER & SONS, A NEVADA PARTNERSHIP; CHARLESTON HEIGHTS BOWL, INC., MARFORD INC., A CALIFORNIA CORPORATION; BECKER & SONS, A NEVADA PARTNERSHIP AND BECKER HOSPITALS OF TEXAS, INC., A CORPORATION AUTHORIZED TO DO BUSINESS IN NEVADA; ALL DOING BUSINESS AS MARBECK, A NEVADA CORPORATION; WESTERN SUPPLY CORPORATION; AND KIMMEL ENTERPRISES, INC., DOING BUSINESS AS LEWIS HOMES OF NEVADA, A NEVADA PARTNERSHIP; AND NEVADA YOUNG AMERICAN HOMES, INC., APPELLANTS, v. LAS VEGAS VALLEY WATER DISTRICT, A PUBLIC QUASI MUNICIPAL CORPORATION, RESPONDENT.

No. 15343

January 15, 1985                                        693 P.2d 1255

---

[2]THE HONORABLE DAVID ZENOFF, Senior Justice, was designated by the Governor to sit in place of THE HONORABLE CHIEF JUSTICE NOEL E. MANOUKIAN who voluntarily disqualified himself from consideration of this case. Nev. Const., art. 6, § 4.

THE HONORABLE JUSTICE JOHN C. MOWBRAY also voluntarily disqualified himself from consideration of this case.

[Rehearing denied May 21, 1985]

*Jones, Jones, Close & Brown*, and *Gary R. Goodheart*, Las Vegas; *Kenneth C. Hamister*, Elyria, Ohio, for Appellants.

*Robert Miller*, District Attorney, *Bryon Toma*, Deputy District Attorney, Las Vegas; *Urban J. Schriener* and *Bruce D. Snyder*, Los Angeles, California, Attorneys for Respondent.

*Roy A. Woofter*, North Las Vegas City Attorney, Amicus Curiae.

*Shauna M. Hughes*, City Attorney for Henderson, Amicus Curiae.

*Robert L. Van Wagoner*, City Attorney for Reno, Amicus Curiae.

## OPINION

*Per Curiam:*

This is an appeal from a judgment entered for respondent, the Las Vegas Valley Water District, denying appellants' request for declaratory, injunctive, and other relief. The appellants, principally the Southern Nevada Homebuilders Association, Inc., a trade organization, challenged the ruling of the district court that certain sections of the Water District's 1975 service rules imposing connection fees as a pre-condition of obtaining new or expanded water service are legal. Because we agree with the Association's contention that the Water District exceeded its statutory authority by imposing a fee on new customers in order

to pay for expansion within the existing system, we reverse the decision of the district court.

## THE FACTS

The Water District is formed under the provisions of Chapter 167 of the 1947 Statutes of Nevada, commonly known as the Las Vegas Valley Water District Act. Pursuant to authority granted in this Act, the Board of Directors of the Water District establishes and promulgates written rules and regulations for the distribution and use of water within the Water District's boundaries;[1] and the Water District establishes rates and charges for water.

Through the rules and regulations, the Board governs the Water District. Two groups are affected by the Water District's policies on rates and charges: the customers, or water users, and the applicants, a group consisting mainly of property developers. Various mixes of rates and charges have been used by the Water District in an attempt to balance the burden imposed by each group. In general, the customers are charged a flat rate plus an amount based on the water used. The Water District's water sales revenues have historically produced an annual net profit after deducting all expenses, including depreciation and interest. These surplus revenues are used to repay the bond indebtedness, to replace worn or obsolete equipment, and to expand the Water District's facilities. The Water District has obtained funds for the acquisition and expansion of its major facilities through long-term borrowing under its general obligation bond authority contained in § 16d of the Act.

The group referred to as the applicants has been required to contribute to the costs of providing new services. Since 1955 the developers have been required to build off-site main extensions from the development to the existing system (defined in the Water District rules as a "feeder main"). When the developer has been required to install an oversized main, if requested to do so by the Water District, the developer pays only for that cost of the main capacity necessary to serve his development. Since 1960, the Water District has collected a connection fee from those tying into a Water District-constructed main. Subsequent developers have been charged a fee for connecting to a main constructed by others. The developers are required to build at their own expense whatever water mains are necessary within their development's boundaries.

Because of the rapidly increasing population in the area served by the Water District, the Act has been amended numerous times, which has been followed by corresponding changes within the

---

[1]The Water District serves the Las Vegas Valley area of Clark County except the cities of North Las Vegas and Henderson.

rules and regulations. In 1975, the legislature amended § 16d to provide specifically that the Water District be authorized to charge a connection fee. After this enactment, the Water District implemented its new service rules imposing a "feeder main connection charge" on all new applicants to the system. The new rules attempted to equalize the burden on developers by providing that the initial developer installing the feeder main from the development to the existing system receive a credit for the amount paid for the main against the feeder main connection charge imposed on the development. The developer then pays the difference, if the connection charge is greater. If the cost of the main exceeds the connection charge, the developer is entitled to reimbursement from subsequent applicants connecting to that main. The feeder main connection charge is imposed on all new applicants regardless of whether the development connects directly to the existing system or utilizes a newly installed feeder main.

The money collected from this charge is not segregated but it is placed within the general fund. The money has been used, in part, to reimburse developers for their costs of installing the feeder mains. In addition the money has been spent on oversizing mains being built by developers so that anticipated growth in an area could be accommodated by the system quickly. The money has also been utilized, however, for bolstering or reinforcing water mains within the existing system in order to provide for increased demand and capacity for the new growth.

### THE FEEDER MAIN CHARGE

The Association suggests that the feeder main connection charge is illegal for various reasons. Because we find it exceeds the authority granted to the Board by the legislature, only this issue need be discussed.

The district court found that the Board had the authority under either § 16d or § 19.1 of the Act to impose the feeder main connection charge. Section 16d, as amended, provides in part:

> It is the intent of this act that, so far as possible, the principal of and interest on any bonds issued by the district shall be paid from revenues from the works and properties of the district. The board shall from time to time establish reasonable rates and charges for the products and services furnished by such works and properties, and no board or commission other than the governing body of the district shall have authority to fix or supervise the making of such rates and charges. Such rates and charges may be in such forms as, but not exclusively limited to, service charges, monthly commodity charges, late charges, delinquent processing charges,

lump-sum installment charges, or *connection charges if such rates and charges represent an equitable allocation and recovery of costs of providing facilities and delivery of water service. . . .* Subject to the limitation that the rates and charges be reasonable, the board shall fix rates and charges which will produce sufficient revenues to pay the operating and maintenance expenses of such works and properties, the general expenses of the district, and the principal of and interest on all outstanding bonds of the district as the same fall due and any payments required to be made into any sinking fund for said bonds. . . . (Emphasis added.)

The Board is given extensive authority by this section to impose rates and charges. This authority, however, is limited by the requirement that such rates and charges be "an equitable allocation and recovery of costs of providing facilities and delivery of water service."

We do not believe that imposing a feeder main connection charge to aid in funding the major construction projects of the Water District is such an equitable allocation. Instead, we conclude that the Board is limited to charging a connection fee only if it is used to recover costs identifiable with the properties charged. Thus the costs of building a "feeder main" would be proper, as would the initial costs of oversizing the lines to prepare for anticipated growth. Financing the bolstering or enlarging of lines already part of the existing system, however, is outside the scope of power given in § 16d.[2]

We believe that to conclude otherwise allows the Water District to recover the costs of the same facilities twice. The Water District is empowered by § 16d to charge water rates to recover the costs of delivery of service and to issue bonds to provide for the major construction projects, with the interest and principal being paid from the revenues of the Water District. The evidence produced at trial showed that the water rates collected were ample to pay for the costs of system expansion and replacement of obsolete or worn parts in the system. To allow the Water District to charge water rates to its customers, issue bonds, and then also to charge a connection fee to pay for some of the major construction projects, permits the Water District to expand its surplus revenue after the costs of providing the service have already been recovered. Such is not the intent of the legislature.

Finally, it is not equitable that the new applicants for service be forced to pay a connection fee which is spent on a facility which may not benefit them or which benefits *all* members of the

---

[2]Our decision is limited to those mains discussed above. We thus reject the District's attempt to label any and all mains as "feeder mains" for the purpose of coming within the statute.

system. Although it may be necessary for some purposes for the Water District to divide the people affected by its rules into two groups—the customers and the applicants—it is not equitable to impose a charge on only one of the groups when the funds produced are used to pay for facilities benefiting both groups. The Water District can impose its water rates and issue bonds to recover the costs of providing facilities and delivery of service benefiting both groups; it can only impose a separate fee on the new applicants fairly if it recovers the costs directly identifiable with the applicants' properties.

The district court also found that the charge was authorized under § 19.1 of the Act.[3] Although this section grants the Water District authority to act under the provisions of other Nevada Revised Statutes which apply to public districts of the state, this authority is qualified to the extent that such provisions "are not in conflict with this act." None of the statutes discussed by the district court contains the limitation which we find controlling as to the legislature's intent in § 16d. To the extent that the statutes permit a connection charge unrelated to costs of providing service to the charged property they are inconsistent with § 16d and thus cannot be used as authority to permit the Water District's charge.

In summary, we conclude that the Board is limited to imposing a feeder main connection charge *only* if it is used to recover costs identifiable with the properties charged. Any other charge does not represent "an equitable allocation and recovery of costs of providing facilities and delivery of water service" as required by § 16d of the Act and is outside the power granted to the Board by the legislature.

We therefore order this judgment reversed and the case remanded for further proceedings consistent with this opinion.

SPRINGER, MOWBRAY and GUNDERSON, JJ., and FOLEY, D. J.[4] and McGROARTY, D. J.,[5] concur.

---

[3]Section 19.1 of the Act states:

> Any powers expressly granted by this act are in addition to other powers available to the district under the general laws of this state. All provisions of Nevada Revised Statutes which apply to public districts of the state and which are not in conflict with this act may be utilized by the district in order that such district may carry out its corporate purposes in the most efficient manner.

[4]The Governor designated The Honorable Thomas Foley, Judge of the Eighth Judicial District Court, to sit in the place and stead of THE HONORABLE NOEL MANOUKIAN, Chief Justice, who voluntarily recused himself. Nev. Const., art. 6, § 4.

[5]The Governor designated The Honorable John S. McGroarty, Judge of the Eighth Judicial District Court, to sit in the place and stead of THE HONORABLE THOMAS L. STEFFEN, Justice, who voluntarily recused himself. Nev. Const., art. 6, § 4.